IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| LOREN DOWNARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 05-806-TC |
| v. | ) | |
| | ) | FINDINGS AND |
| JO ANNE B. BARNHART, Commissioner of | ) | RECOMMENDATION |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

COFFIN, Magistrate Judge:

### INTRODUCTION

Plaintiff Loren Downard brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). The Commissioner's decision should be affirmed.

1 - FINDINGS AND RECOMMENDATION

## BACKGROUND

Downard was born on May 29, 1972. He earned a high school equivalency diploma and worked as a production supervisor, warehouse worker, grade worker, cook and laborer. He worked in the warehouse of a grass seed producer until his alleged disability began. After a period of alleged disability, he began working as a sales person.

Downard developed acute onset of low back pain after pouring concrete at his home in April 2001. He continued to work until the pain became severe and spread to his neck and hips. He stopped working on November 7, 2001. His physical condition gradually improved with inactivity, but he developed depression.

Downard's physical condition eventually improved to the point that his pain was controllable. Meanwhile, through vocational rehabilitation services, he found that he could work if permitted to alternate sitting and standing as needed and returned to work in sales. Downard alleges he was disabled during the interim from November 7, 2001, until December 1, 2003, due to myofascial pain syndrome, degenerative disc disease, problems with the sacrum, nerve damage and depression.

Downard satisfied the insured status requirements for a claim under Title II through September 30, 2003, and must establish that he was disabled on or before that date to prevail on his claim. 42 U.S.C. § 423(a)(1)(A). See Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).

The ALJ found that Downard's ability to perform basic work-related functions was limited by myofascial pain syndrome and cervical disc disease. He found that Downard had the residual functional capacity (RFC) to perform the full range of light work, including the ability to sit, stand or walk for up to six hours in an eight-hour day. He found that Downard's RFC was not significantly diminished by nonexertional limitations.

2 - FINDINGS AND RECOMMENDATION

The ALJ found that Downard's RFC precluded all of his past relevant work, which required the ability to lift, carry, pull and push weights in excess of the limitations for light work. The ALJ applied the Medical-Vocational Guidelines in 20 C.F.R. Part 404, Subpart P, Appendix 2, which dictate a finding of not disabled given the ability to perform the full range of light work and Downard's age, education and work experience.

## DISCUSSION

Downard contends the ALJ failed to assess his RFC accurately because he improperly discredited his subjective testimony and rejected the opinions of Timothy Hill, M.D. and Anita Dekker-Jansen, M.D. Downard argues that the evidentiary errors led the ALJ to apply the Medical-Vocational Guidelines erroneously.

### I.    RFC Assessment

#### A.    Downard's Credibility

Downard testified that he stopped working when pain in his back became so severe that he could not do his job. He testified that he experienced constant numbness in the left thigh from November 2001 until about March 2004, and numbness in the left arm from November 2001 until about September 2003. He had depression which gave him a negative attitude. His depression improved when he started working again and regained confidence.

The ALJ found that Downard was partially credible. He accepted that Downard had myofascial pain syndrome and cervical disc disease resulting in significant limitations in the ability to do basic work activities. He also accepted that Downard had mild mental impairments, but found that they did not significantly limit his ability to perform basic work activities.

Downard contends the ALJ improperly rejected his testimony regarding depression and numbness in the left arm and thigh. He argues that these conditions imposed nonexertional limitations that should have precluded the ALJ's reliance on the Medical-Vocational Guidelines.

Downard's testimony about numbness and depression did not describe any functional limitations from these conditions or assert that they precluded him from performing any work-related activity. He testified that he stopped working due to back pain and began working again when he found a job in which he could avoid back pain by changing position as needed.

Correspondingly, the ALJ did not reject Downard's testimony regarding numbness and depression. Instead, he found that these symptoms were mild at most and did not cause functional limitations or have a significant effect on Downard's ability to do basic work-related activities. The ALJ's decision is consistent with Downard's testimony about numbness and depression.

Assuming, for the sake of Downard's argument, that his testimony included functional limitations from these conditions and that the ALJ rejected the testimony by finding no such functional limitations, the ALJ did so after properly evaluating the testimony in context with the record as a whole.

An ALJ must provide clear and convincing reasons to discredit a claimant's testimony regarding the severity of his symptoms. Dodrill v. Shalala, 12 F3d 915, 918 (9th Cir 1993); Smolen v. Chater, 80 F3d 1273, 1281-82 (9th Cir 1996). The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." Orteza v. Shalala, 50 F3d 748, 750 (9th Cir 1995).

The ALJ may consider objective medical evidence and the claimant's treatment history as well as the claimant's unexplained failure to seek treatment or follow a prescribed course of

treatment. Smolen, 80 F.3d at 1284. The ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge about the claimant's functional limitations. Id. In addition, the ALJ may employ ordinary techniques of credibility evaluation such as prior inconsistent statements concerning symptoms and statements by the claimant that appear to be less than candid. Id. 20 C.F.R. § 404.1529.

The ALJ noted that the objective medical evidence did not support significant limitations from numbness and depression. For example, diagnostic x-ray images of all regions of the spine were negative shortly after Downard's injury. Tr. 181. In August 2001 MRI studies were normal for the thoracic and lumbar spine with mild diffuse bulging in the cervical spine. The MRI showed one area of disc protrusion, but did not show spinal cord or nerve root compression that might cause numbness. Tr. 169-70.

In October 2001 Downard's primary care provider referred him to Cecilia Keller, M.D., for a neurological evaluation of Downard's complaint of numbness in the left thigh and right arm. Dr. Keller performed an electromyography (EMG) study which revealed no evidence of denervation. Dr. Keller admitted that technical difficulties prevented conduction measurements across the ulnar nerve. Because the ulnar nerve runs to the wrist and hand, it is reasonable to conclude that these technical difficulties had no effect on the EMG results related to Downard's thigh. Additionally, Downard's testimony referred to numbness in the left arm while Dr. Keller's EMG evaluation focused on Downard's right arm. Tr. 154. Accordingly, the deficiencies in the EMG study have no relation to Downard's testimony.

Clinical findings were similarly unremarkable regarding numbness in the thigh and arm. For example, during physical therapy in October 2001, Downard's sensation was intact, but "somewhat

5 - FINDINGS AND RECOMMENDATION

different" on the left. Tr. 159-60. He reported a numb area on the left anterior thigh which was "not too bothersome for him." Tr. 225.

Days before the alleged onset date, Daniel Dale, M.D., found that Downard had no neurological symptoms, no paresthesias and his strength and reflexes were intact. Tr. 205. In December 2001, Paul Hochfeld, M.D., found that Downard had good strength in the lower extremities with "possibly diminished sensation of the left thigh." Tr. 204. At a physical examination in January 2002, Downard could heel and toe walk normally and his strength in the lower extremities was intact without deficits in reflexes or sensation. Tr. 221-22.

At a physical examination in March 2002, Downard demonstrated no pain behavior and had no difficulty performing any of the requested maneuvers. He had normal gait and weight-bearing while standing. His spinal examination was normal. His neurological examination, including deep tendon reflexes, motor strength, sensation and balance, was completely normal. Tr. 264-66.

Downard reported left thigh numbness possibly correlated with low back pain in August 2002, but when Craig Graham, M.D., performed a complete examination in November 2002, he found Downard's upper and lower extremity strength, reflexes and sensation unremarkable. Tr. 213. There is no other medical evidence of numbness.

Downard's treatment history did not include any reported functional limitation from his somewhat diminished sensation in the thigh and arm. Downard did not complain of numbness or any other radicular symptoms following his injury in April 2001. Tr. 181, 185. He first reported the altered sensation in August 2001 as burning pain associated with numbness. Tr. 175. Notably this did not prevent Downard from continuing his full-time job and he reported working 16-hour days

in September 2001. Tr. 167. Downard complained of numbness infrequently thereafter and the intensity of the sensation he described diminished.

In summary, the ALJ considered the dearth of objective and clinical evidence of any condition that would produce numbness, the absence of any claim of functional limitation caused by numbness, the infrequency with which Downard reported numbness to physicians and Downard's ability to work more than full time during the period when he reported the most intense symptoms associated with numbness. The ALJ could reasonably conclude from this that Downard experienced numbness that was intermittent and mild at most and did not significantly affect his ability to perform basic work-related activities. Accordingly, the court finds no error in the ALJ's evaluation of Downard's testimony regarding numbness.

The objective and clinical evidence of functional limitations from depression is equally unimpressive. In June 2001 Robin Lannan, M.D., prescribed a cyclic antidepressant as an alternative to Downard's chronic use of narcotic pain medications, but did not note any symptoms of depression. Tr. 183.

On February 12, 2002, Guerin Bernardin, Psy.D. performed a psychological evaluation to determine Downard's suitability for participation in a multi-disciplinary pain clinic. Dr. Bernardin found no apparent concentration, attention or memory problems and Downard's overall judgment appeared fair. His intellectual capacities appeared to be average or above average and Dr. Bernardin observed no pain behaviors. Downard had psychometric measures consistent with one who functions effectively in daily life, albeit with decreased efficiency. He scored in the normal range on a depression scale. Tr. 275-80.

On February 20, 2002, Downard told Dr. Graham that he was "considering that depression might be contributing" to his discomfort and admitted that he had not started antidepressant medications prescribed in the past. Tr. 220.

On discharge from the pain clinic in April 2002, Downard reported an improvement in mood and function with decreased use of narcotic pain medications. Dr. Bernardin found "no current support for psychological symptoms that would limit him from employment at this time" and noted that "[Downard] is not currently experiencing depression, anxiety or irritability." Tr. 258, 262.

Dr. Bernardin thought it possible that Downard's transition back to work might elicit depression, anxiety or irritability, and recommended individual therapy sessions to help him effectively deal with that possibility. Downard declined and "expressed confidence that he could resolve the issues confronting him without further psychological intervention." Tr. 262. As it happened, Downard testified that his return to work gave him confidence and relieved his depression instead of eliciting the unwanted symptoms Dr. Bernardin feared.

The agency reviewing psychologist, Bill Hennings, Ph.D., prepared a Psychiatric Review Technique Form based on all the medical and psychological records in the file. He found that they supported no functional limitations in any of the four broad categories of mental functioning, i.e. difficulties in activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace and episodes of decompensation. Tr. 298. Dr. Hennings acknowledged some references to depression, but opined that Downard had no severe mental impairment from it. Tr. 288, 291, 302.

The ALJ reviewed lay witness statements and Downard's subjective questionnaires describing his daily activities. The ALJ concluded that these sources supported mild restrictions in

8 - FINDINGS AND RECOMMENDATION

activities of daily living, mild difficulties in maintaining social functioning and "none to mild limitations in maintaining concentration, persistence or pace." Tr. 16. Downard's testimony did not include assertions of greater limitations than these.

In summary, the ALJ considered the minimal objective and clinical evidence of depression, the absence of any assertion of functional limitations stemming from depression and the lay evidence of mild limitations in broad categories of function. The ALJ could reasonably conclude from this that Downard experienced mild depression that had no impact on his ability to perform basic work related activities. The court finds no error in the ALJ's evaluation of Downard's testimony regarding psychological impairments.

### B.     Medical Source Statements

Timothy Hill, M.D., examined Downard once, on October 15. 2001, on a referral from Downard's primary care physician for evaluation of back pain. Dr. Hill's physical examination revealed normal and symmetric muscle bulk in the neck, torso, back and extremities and normal alignment. Downard had normal range of motion in the cervical and thoracic spine, but some limitation in the lumbar range of motion "due to self-reported pain." Tr. 305. Straight-leg-raise tests were negative for any radicular findings.

Dr. Hill found numbness in the left lateral thigh, without distal numbness elsewhere in the legs. He described the area of numbness as "Meralgia paresthetica involving the left leg (left lateral femoral cutaneous mononeuropathy)." Tr. 305. He did not indicate any functional limitation from this area of numbness and noted that Downard demonstrated full strength in all muscle groups, including both legs.

Anita Dekker-Jansen, M.D., took part in a limited pain evaluation to determine whether it would be appropriate for Downard to participate in a pain clinic. She interviewed and examined Downard on February 12, 2002. In the neurological portion of her examination, Dr. Dekker-Jansen noted: "Sensory exam essentially within normal limits, although there may be an area of decreased sensation on the left lateral anterior aspect of the thigh." Tr. 272. She assessed this to be "Meralgia paresthetica, left thigh, most likely secondary to wallet in left back pocket and belt worn on a regular basis with prolonged sitting." Tr. 273. She recommended as follows: "Given that he appears to have meralgia paresthetica, we suggested he not use a belt, and use a thin wallet alternating in different pockets." Tr. 274.

Downard argues that the ALJ improperly rejected without explanation the opinions of Dr. Hill and Dr. Dekker-Jansen regarding the area of reduced sensation on his thigh. These physicians' reports did not describe or suggest impairment of any work-related function and the ALJ's RFC assessment did not contradict their opinions. The ALJ did not reject their opinions, explicitly or implicitly, and he had no duty to explain his reasons for doing so.

To summarize, Downard's testimony and the reports of Drs. Hill and Dekker-Jansen did not establish the existence of nonexertional functional limitations from numbness in the left thigh and arm or from depression. Downard's challenges to the ALJ's evaluation of the evidence cannot be sustained. Accordingly, the court finds no error in the ALJ's RFC assessment.

## II.    Medical Vocational Guidelines

Downard argues that the ALJ erred by applying the Medical-Vocational Guidelines in step five of the sequential evaluation. He contends the ALJ should have utilized a vocational expert because his occupational base is reduced by nonexertional limitations.

At step five of the sequential evaluation process, the burden shifts to the Commissioner to show that there are a significant number of jobs in the national economy that the claimant can perform. 20 C.F.R. § 404.1560(c)(2). The ALJ may satisfy this burden through the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines. Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999).

The Medical-Vocational Guidelines are predicated on a claimant's having an impairment which manifests itself in exertional limitations. Accordingly, they may not be fully applicable if the claimant's impairment results in nonexertional limitations, such as deficits in mental function or sensory limitations having significant impact on the ability to perform basic work-related activities. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e). When such nonexertional limitations are present, the ALJ uses the Medical Vocational Guidelines as a framework, but may also need vocational expert testimony to determine whether the nonexertional limitations significantly diminish the number of occupations suitable for the claimant. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)(2); SSR 83-12; SSR 85-15.

Downard argues that the ALJ's application of the Medical-Vocational Guidelines was erroneous because the ALJ found he had nonexertional impairment in the broad categories of mental function described previously, including "none to mild limitations in maintaining concentration, persistence or pace." Tr. 16.

The four broad categories of mental function are used at steps two and three of the sequential evaluation process to rate the severity of the impairment and, if it is "severe," to determine whether it satisfies the criteria for any of the presumptively disabling conditions in the Listing of Impairments. 20 C.F.R. § 404.1520a(d).

11 - FINDINGS AND RECOMMENDATION

If the degree of limitation in the four broad categories is "mild" or "none" as in Downard's case, the Commissioner "will generally conclude that [the claimant's] impairment is not severe." 20 C.F.R. § 404.1520a(d)(1). By definition, an impairment that is not severe has no significant effect on a claimant's ability to do basic work activities. 20 C.F.R. § 404.1521(a).

Consistent with the regulations, the ALJ properly concluded that Downard's mild depression was a nonsevere impairment which did not diminish his ability to perform the full range of light work. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (mild depression properly determined to be nonsevere); Blacknall v. Heckler, 721 F.2d 1179, 1181 (9th Cir. 1983) (proper to apply the Medical-Vocational Guidelines where psychiatric impairments do not significantly limit the range of work permitted by the claimant's exertional limitations).

In summary, Downard's challenge to the ALJ's application of the Medical-Vocational Guidelines is untenable because Downard failed to show that his nonexertional impairments had significant impact on his ability to perform basic work related activities. The presence of "none to mild" limitations in any of the four broad categories of mental function does not establish functional limitations that would reduce the ability to perform the full range of light work.

## **RECOMMENDATION**

Based on the foregoing, the ALJ's determination was based on proper legal standards and supported by substantial evidence. The Commissioner's final decision should be affirmed and the case should be dismissed.

DATED this 31 day of August, 2006.

_____
Thomas M. Coffin
United States Magistrate Judge

13 - FINDINGS AND RECOMMENDATION